United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WAITHIRA NJENGA,

   Plaintiff,

 v.

SAN MATEO COUNTY
SUPERINTENDENT OF SCHOOLS,  et al.,

   Defendants.
_____/

No. C-08-04019 EDL

**ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

   In this employment discrimination case, Plaintiff Waithira Njenga alleges that she was subjected to a hostile work environment, discrimination and retaliation based on her race, gender, color and national origin.  Plaintiff was employed as a vocational education specialist in the Secondary Services Division of the San Mateo County Office of Education from 1993 until 2007.

   On November 10, 2009, Defendants moved for summary judgment. The Court subsequently granted Plaintiff's request for an extension of the briefing schedule, and held a hearing on Defendants' motion on February 23, 2010.  The parties submitted supplemental briefs on various issues on March 8, March 9, March 16 and March 17, 2010.  For the reasons stated at the hearing and in this Order, Defendants' Motion for Summary Judgment is granted in part and denied in part.

**Facts**

   Plaintiff is of African descent and Kenyan national origin.  See id. ¶ 2.  She came to the United States for her education sometime before 1980.  See id. ¶¶ 4-5.  From 1993 through 2007,

she usually traveled to Kenya at least once per year. <u>See id.</u> ¶ 3.

Plaintiff began her employment with the San Mateo County Office of Education (SMCOE) on February 3, 1993 as a Vocational Education Specialist assigned to the WorkAbility program in the Secondary Services Division. <u>See</u> Njenga Decl. ¶ 7. Her duties in this position were, among other things, to act as a liaison between Special Education day class teachers and the Vocational Education Training Program, to develop and provide in-service training, and to provide on-site assessments for Special Education students. <u>See id.</u> ¶ 10. She received positive performance evaluations. <u>See id.</u> ¶ 12.

Plaintiff stated that throughout her employment, she was excluded from unit meetings at which decisions about work assignments were made by group consensus. <u>See id.</u> ¶ 34, 39. Even if she was not excluded, when she would walk into a meeting, all conversation would stop and the room would become silent. <u>See id.</u> ¶ 35. Plaintiff was ignored and disrespected. <u>See id.</u> Plaintiff stated that group decisions were routinely made over her objections and resulted in her being assigned to schools in the extreme ends of the County and with the most severely disabled students. <u>See id.</u> ¶¶ 40-43.

Defendant Pex stated that she has never excluded Plaintiff from any staff meeting, and that meeting dates were published and known to all in advance of the meeting dates. <u>See</u> Pex Decl. ¶ 6(d). Pex also stated that she would periodically conduct meetings with individual counselors and other employees to which Plaintiff would not be invited if the meeting did not pertain to Plaintiff. <u>See id.</u> Further, Pex stated that to the extent that Plaintiff accused Pex of giving Plaintiff the least desirable assignments, Pex, as the supervisor, was not involved in assigning teaching aides and site locations, which were determined by consensus among the vocational counselors, or assigning teaching hours, which were determined by each Vocational Education Specialist. <u>See</u> Pex Decl. ¶ 6(e), ¶ 6(f).

Plaintiff stated that in 1997, a white male Special Education teacher referred to a student using the "N" word in Plaintiff's and the student's presence. <u>See id.</u> ¶ 21. Plaintiff also heard this teacher refer to his teaching assistant as a bitch and "white trash." <u>See id.</u> ¶ 23. Plaintiff stated that this teacher also asked her for a date and said that he was sexually attracted to her. <u>See id.</u> ¶ 24. She

**United States District Court**
For the Northern District of California

**United States District Court**
For the Northern District of California

1   complained to her white male supervisor, John Piper, but he ignored her.  See id. ¶ 25.  On February

2   23, 1998, Dr. Cecil Reeves, the Personnel Director at SMCOE until 2003, sent a memo to Plaintiff

3   stating that he had completed an investigation of this incident, but was unable to find a corroborating

4   witness.  See id. ¶ 29.

5        In early 2000, Plaintiff's supervisor, John Piper, asked her about henna designs she had on

6   her body after returning from Kenya, and how the body art would "affect things."  See id. ¶ 14.

7   Shortly thereafter, a white colleague, Marsha Castell-Blanch, asked if the tribal body art was black

8   magic.  See id. ¶ 15.  Other co-workers over the years have also asked about Plaintiff's body art that

9   she obtained in Kenya.  See id. ¶ 16.  Plaintiff has also brought back tribal artifacts from her travels

10  to Kenya, which she would display in her work area, and about which co-workers would comment

11  negatively.  See id. ¶ 18.

12       During the fall of 2000, Plaintiff informed John Piper that she was having trouble with Elaine

13  Hawley, a white female support staff member whom Plaintiff believed was causing a hostile work

14  environment.  See id. ¶ 30.  Piper suggested a mediator, but Plaintiff thought that mediation would

15  be futile and did not participate.  See id. ¶ 32.

16       Plaintiff stated that from 2001 through 2005, Debbie Burse, the custodian, refused to clean

17  Plaintiff's work area or empty her trash can.  See Njenga Decl. ¶ 48.  Plaintiff also stated that Burse

18  failed to restock Plaintiff's work area with Kleenex and other items that she put on other co-

19  workers' desks.  See Njenga Decl. ¶ 60.  When Plaintiff confronted Burse, Burse made derogatory

20  statements based on Plaintiff's race.  See id. ¶¶ 48-49.  In the spring of 2004, an overgrowth of

21  mold, ivy and spiders completely covered one side of Plaintiff's work area because Burse refused to

22  clean it.  See id. ¶ 50.  Burse would aim her cleaning cart at Plaintiff and push it toward Plaintiff in a

23  menacing manner.  See id. ¶ 51.  Plaintiff reported these incidents to Pex in 2003-3004, but Pex took

24  no corrective action.  See id. ¶ 53.  Pex stated that she never directed Burse not to clean Plaintiff's

25  work area, and that she directed Burse to work harder to make sure that she did not leave any

26  impression that Burse was treating Plaintiff differently.  See Pex. Decl. ¶ 6(a).  Pex had no

27  knowledge of discriminatory remarks made by Burse or of whether Burse had any discriminatory

28  animus toward Plaintiff.  See id.  On December 2003, Pex helped to resolve the issues between

3

Burse and Plaintiff by having Burse write a letter of apology to Plaintiff.  See id. Ex. B.  On January

23, 2004, Plaintiff thanked Pex for her efforts in resolving the dispute between Plaintiff and Burse.

See id. Ex. C.  Further, Reynoso Santa Cruz, the SMCOE Chief Negotiator/Senior Administrator for

Personnel, investigated Plaintiff's claims in the fall 2003 that her work area was tampered with and

that Burse had refused to clean it.  See Santa Cruz Decl. ¶ 3.  He did not find any specific employee

at fault and was unable to determine that the incidents were due to race or national origin

discrimination.  See id. ¶ 3.

Plaintiff stated that she was only taken seriously by two black managers, Cecil Reeves,

SMCOE's Personnel Director, and Princess Tucker-Jones, Assistant Education Services Manager

for Secondary Services Division.  See Njenga Decl. ¶ 65.  Reeves investigated Plaintiff's concerns

about racism in 2001, and he recommended some cultural sensitivity training for the staff.  See id. ¶

66; see also Pex Decl. ¶ 6(c).  Pex stated that Reeves did not find any evidence of discrimination or

harassment of Plaintiff, but concluded that Plaintiff's aggressive conduct toward her fellow

employees was behind many of her work disputes.  See Pex Decl. ¶ 6(b).  Plaintiff also stated that

Reeves conducted a lecture on civility, but that he was met with anger from the staff.  See Njenga

Decl. ¶¶ 68-70.

During the time that Pex was Plaintiff's supervisor, from the 2003-2004 school year and

again from fall 2006 through Plaintiff's medical leave in February 2007, Plaintiff had difficulties

obtaining office supplies because she had to go through the extra step of having her requests

approved by Harriet Beck, another Vocational Education Specialist.  See Njenga Decl. ¶¶ 55-56.

Pex stated that she never refused any request from Plaintiff for office supplies, nor did she require

any preapproval process for Plaintiff that was different from any other employee.  See Pex Decl. ¶

6(c).  Plaintiff stated that she also had difficulty getting work equipment, such as a chair to replace a

broken one that had a metal pole sticking out of it.  See Njenga Decl. ¶¶ 57-59.  Plaintiff could not

get Burse to fix the chair and then Plaintiff fell off of it.  See id. ¶ 59.  Pex stated that she never

knowingly made Plaintiff use a broken chair.  See Pex Decl. ¶ 6(c).

Plaintiff also stated that her work area was tampered with and trashed on numerous

occasions, and that it was not uncommon for her to find personal items, including her African

artifacts, removed from her desk or scattered on the floor.  See Njenga Decl. ¶ 64.  This occurred

consistently, with the worst times being in the fall of 2003, early 2004 and the fall of 2006.  See id.

In October 2003, Plaintiff sent a memo to Joan Thomas, Pex and Tucker-Jones requesting

assistance in what Plaintiff believed was a hostile work environment.  See Njenga Decl. ¶ 73;

Tucker-Jones Decl. ¶ 21.  A meeting with Tucker-Jones, Pex, Plaintiff and her union representative,

Moberg, occurred on November 19, 2003.  See id. ¶ 74; Moberg Decl. ¶¶ 6, 7; Tucker-Jones Decl. ¶

23.  Plaintiff stated that Tucker-Jones concluded that Pex was treating Plaintiff differently, and that

Pex did not respond to this conclusion at all.  See Njenga Decl. ¶ 74; Tucker-Jones Decl. ¶¶ 30, 31.

Plaintiff believed that Tucker-Jones called meetings, reprimanded Pex, reassured Plaintiff,

and conducted an investigation.  See Njenga Decl. ¶ 76.  Tucker-Jones assigned two Assistant

Managers to attend the Vocational Education Specialist meetings to protect Plaintiff from the

hostility of co-workers.  See id. ¶ 77.  Tucker-Jones completed a written investigation in December

2003 in which she found, among other things, that Pex denied Plaintiff the opportunity to work the

extended school year, that Pex had knowledge of Plaintiff's complaints about cleanliness but did not

act on them, that Pex did not give Plaintiff the opportunity for geographically convenient and

balanced caseloads, that Plaintiff was excluded from meetings and that when Plaintiff spoke at

meetings, her opinions were not considered.  See Tucker-Jones Decl. ¶ 35.

Plaintiff also stated that during 2003-2004 and 2006-2007, Pex routinely made derogatory

comments about black people, referring to them as "those people," and to black communities as

"those places."  See Njenga Decl. ¶ 96.  However, at Plaintiff's deposition, she provided testimony

of only two instances when Pex made comments that Plaintiff believed were derogatory -- a

reference to Plaintiff's ex-husband being white and statements made at a dinner event when waitstaff

began talking to Plaintiff.  See Shupe Decl. Ex. C at 97; 158; 176-78; 474-81.  Pex denies making

any derogatory statements regarding Plaintiff's race or national origin.  See Pex Decl. ¶ 6(h).

Plaintiff also stated that Pex unilaterally changed a form on which Plaintiff had self-

identified as "African," to identification as an "African-American."  See Njenga Decl. ¶ 98.  Pex,

however, denied changing any form.  See Pex Decl. ¶ 6(h).

In May 2004, Plaintiff became ill because of the hostility in her office.  See Njenga Decl. ¶

United States District Court
For the Northern District of California

82.  Plaintiff also stated that she observed her co-workers plotting against Tucker-Jones.  See id. Plaintiff stated that she heard co-workers making negative comments under their breath at presentations by Tucker-Jones.  See id. ¶ 83.  Plaintiff was on leave until June 2004.  See id. ¶ 86.

Plaintiff filed an EEOC charge in May 2004.  See id. ¶ 87; Ex. B; Santa Cruz Decl. ¶ 4; Ex. A.  Santa Cruz was responsible for conducting an investigation into the charge.  See Santa Cruz Decl. ¶ 4.  His investigation did not reveal any specific employee who had racially harassed or discriminated against Plaintiff, but he reached the conclusion that the employees in the WorkAbility unit had trouble relating to each other professionally and he encouraged the manager to address that issue.  See id. ¶ 4.  After completing this investigation, Santa Cruz does not remember hearing any other or further complaints from Plaintiff while he was employed there until he left in January 1, 2007.  See id. ¶ 5.

When Plaintiff returned to work in the fall of 2004, Pex was no longer her supervisor, but Plaintiff stated that Pex came by the office to make negative comments about Tucker-Jones.  See Njenga Decl. ¶ 89.  Pex stated that from July 2004 through the fall of 2006, she had no interactions or involvement with Plaintiff at all.  See Pex Decl. ¶ 5.

In the Spring of 2005, Tucker-Jones intervened so that Plaintiff could attend a professional development conference.  See id. ¶ 78; Tucker-Jones Decl. ¶ 47.  Pex stated that she never excluded Plaintiff from attending any professional conferences.  See Pex Decl. ¶ 6(i).  Tucker-Jones also put a new work order procedure in place so that Plaintiff's orders would get filled.  See Njenga Decl. ¶ 78; Tucker-Jones Decl. ¶¶ 43-46.

Tucker-Jones left SMCOE in summer 2006.  See Njenga Decl. ¶ 91.  Although Plaintiff believes her departure was due to racial hostility, Tucker-Jones testified that she resigned because she wanted to leave the large county office to work in a local school district.  See Shupe Decl. Ex. D at 15.  Tucker-Jones, however, stated that she experienced discrimination while she was employed at SMCOE, and that she suggested sensitivity training for the office.  See Tucker-Jones Decl. ¶¶ 51-60.

Plaintiff stated that Pex refused to promote Plaintiff in the fall of 2006.  See Njenga Decl. ¶ 93.  Pex had announced to the Vocational Education Specialists that she would be replacing the

United States District Court
For the Northern District of California

Head Vocational Education Specialist and interested persons should leave a voicemail for Pex about their interest.  See id.  Plaintiff promptly informed Pex that she was interested, but Plaintiff did not get an application or an interview.  See id.  Pex told Plaintiff that she did not get the position, which had been filled by Harriet Beck, a white female with less experience.  See id. ¶¶ 93-94.  Plaintiff called her union representative.  See id. ¶ 95; Moberg Decl. ¶ 8.  Pex denied that her decision to promote Beck was motivated by race or nationality, and stated that she just chose the best person for the job.  See Pex Decl. ¶ 6(j).

Plaintiff described a conference in Carmel in fall 2006 where Plaintiff was talking about her ancestry with waiters at a dinner.  See Njenga Decl. ¶¶ 100-102.  Plaintiff stated that Pex made negative comments about Plaintiff's discussions about her culture, and rolled her eyes.  See id. ¶ 103.

Plaintiff also stated that in January 2007, Pex took some of the staff to choose new furniture, but would not let Plaintiff choose until after everyone else was finished, and by then, all of Plaintiff's choices had been taken.  See Njenga Decl. ¶ 61.  Plaintiff also stated that Pex would not allow Plaintiff to use her student project stipend.  See id. ¶ 63.

By late February 2007, Plaintiff was exhausted from the hostility at her workplace, was having severe hip pain and was contemplating hip replacement surgery.  See Njenga Decl. ¶ 106. On February 12, 2007, Plaintiff's doctor wrote a note to Plaintiff's employer stating that the surgery was scheduled for March 29, 2007.  See id. ¶ 107.  Plaintiff stated that she gave the note to one of the WorkAbility secretaries a few days after February 12, 2007 (see id. ¶ 107), but she had no explanation in her earlier deposition for why the note was time-stamped March 8, 2007.  See Shupe Decl. Ex. C at 244-45.  Plaintiff stated that she needed some time off to evaluate whether to have the surgery.  See Njenga Decl. ¶ 110.  Plaintiff stated that Harriet Beck, the Head Vocational Education Specialist, suggested that Plaintiff work from home and Plaintiff said that she would develop a detailed plan to account for her five day absence, and that her training assistant Stephanie Luchessi, would sign her out.  See id. ¶¶ 111-12.  Plaintiff stated that she discussed this with Luchessi and told the teachers at her school sites that she would be absent.  See id. ¶¶ 112-13.  Plaintiff took time off as planned, and spent the time evaluating her surgery options.  See id. ¶ 115.

United States District Court
For the Northern District of California

1    Meanwhile, on March 5, 2007, when Plaintiff did not attend a regularly scheduled

2 WorkAbility/Vocational Education staff meeting, Pex became worried about Plaintiff because

3 several Specialists stated that they had not seen or heard from Plaintiff in weeks, and because Pex

4 did not recall seeing her during that time period either. See Pex Decl. ¶ 7. Pex tried to contact

5 Plaintiff on her cell and home phones on March 5, 2007, leaving messages. See id. She also

6 contacted Mike Aaronian in the human resources department to see if he knew whether Plaintiff was

7 on leave. See id. Aaronian had no such information. See id. Pex was concerned, so she contacted

8 Laurie Mouton, a County Superintendent employee who works in payroll, to see if she had any

9 communication from Plaintiff. See id. Mouton had not. See id. She became even more concerned

10 and so spoke with the senior administrator, Carol Harriman, about it. See id. Harriman had also not

11 heard from Plaintiff in weeks. See id. Pex did not participate in any further efforts to ascertain

12 Plaintiff's whereabouts. See id.; Harriman Decl. ¶ 3.

13    Harriman was also concerned, so she talked with Aaronian about the options, one of which

14 was to call the local police department and have them do a welfare check. See Harriman Decl. ¶ 3.

15 Harriman decided that this was a good option, and instructed Aaronian to do so. See id. She did not

16 tell Aaronian or the police to break down Plaintiff's door. See id. Aaronian called the police on or

17 about March 7, 2007. See id.; see also Bosley Decl. ¶ 3. At around 8:00 p.m. on the same day that

18 Aaronian called the police, Harriman received a call from Plaintiff, and Harriman informed Plaintiff

19 that they had been so worried that they had called the police. See Harriman Decl. ¶ 4. Harriman's

20 actions were not motivated by race or retaliation. See id. Pex also received a return call from

21 Plaintiff on March 8, 2007, during which Pex explained that Plaintiff needed to call in when she was

22 going to be absent. See Pex Decl. ¶ 8.

23    The police broke down Plaintiff's door on or about March 6, 2007. See Njenga Decl. ¶ 116.

24 Plaintiff blames Pex for not contacting other people who might have known where she was instead

25 of escalating the matter to the police. See Njenga Decl. ¶ 125. Plaintiff claims that Pex should have

26 asked Luchessi or Beck about Plaintiff's whereabouts. See id. Further, Jacque Taliaferro, another

27 teacher, conducted her own investigation that revealed that Pex did not talk to several people who

28 might have known where Plaintiff was during this time. See Taliaferro Decl. ¶¶ 18-20; Moberg

United States District Court
For the Northern District of California

Decl. ¶ 10.

Taliaferro, who is an African-American woman, also stated that she had difficulties with Pex. In 1994, Pex reprimanded Taliaferro for bringing her grandchild to work because the babysitter fell through. See Taliaferro Decl. ¶¶ 5-8. In 2003, Pex reprimanded Taliaferro for trying to get the attention of an Instructional Aide who was improperly sharing information about a student with her parents. See id. ¶¶ 11-13. In the fall of 2003, Pex made two attempts to get Taliaferro out of a meeting with Tucker-Jones to attend another meeting with Pex. See Taliaferro Decl. ¶¶ 17-18.

On or about March 8, 2007, Pex reprimanded Plaintiff for false entries in her time sheet based on Plaintiff working from home, which was not allowed. See Njenga Decl. ¶ 127. Plaintiff states that Pex told her to change her time sheets for the days in March when she was working from home because working from home is forbidden. See Njenga Decl. ¶ 127. Plaintiff stated that other white employees were allowed to work from home. See id. ¶ 128. Plaintiff changed her time sheets. See id. ¶ 130. Elsewhere, Plaintiff stated that she was not reprimanded for anything other than another incident involving employee Lisa Suruki. See Shupe Decl. Ex. C at 182-83. Further, Defendant Bosley, who became the Associate Superintendent for Human Resources at SMCOE in April 2007, states that a review of Plaintiff's personnel file reveals that there was only one reprimand, which had to do with Suruki. See Bosley Decl. ¶ 6.

On March 20, 2007, Plaintiff filed a grievance alleging an unsafe work environment stemming from the filing of the false missing person's report. See Njenga Decl. ¶ 131; Moberg Decl. ¶ 9. Pex investigated this complaint, but stated that she did not receive an answer from Plaintiff as to how a police welfare check at home could be an unsafe work condition as cited in the grievance. See Pex Decl. ¶ 9. Pex denied the grievance, and stated that she was not motivated by race or national origin or gender. See id. ¶ 9; Ex. D; Moberg Decl. ¶ 13. Pex noted that at no time from the fall of 2006 through March 2007 did Plaintiff complain to Pex that she felt discriminated against or retaliated against. See Pex Decl. ¶ 10. Plaintiff had hip surgery on March 29, 2007. See Njenga Decl. ¶ 132.

On June 7, 2007, Plaintiff attended a Level 2 grievance meeting with Bosley, Moberg and Taliaferro, relating to Plaintiff's complaint about the police welfare check. See id. ¶ 133; Moberg

Decl. ¶ 15.  This was Bosley's first contact with Plaintiff.  See Bosley Decl. ¶ 4.  Plaintiff was upset by Bosley's disrespectful conduct at the hearing.  See Njenga Decl. ¶ 134.  Plaintiff stated that during this time, she received harassing phone calls from Bosley in June 2007, who defied Plaintiff's doctor's orders not to contact Plaintiff.  See id. ¶¶ 135, 136.  Although Bosley admits calling Plaintiff in June 2007 regarding another matter, the doctor's note prohibiting contact with Plaintiff was not written until August 2007.  See Bosley Decl. Ex. E.  Bosley denied Plaintiff's grievance, which she found to have nothing to do with Plaintiff's race or national origin or prior complaints. See Bosley Decl. ¶ 4; Ex. A.  Plaintiff's union representative, Moberg, stated that he received a reprimand from Bosley based on his conduct in the office immediately following the level 2 grievance meeting, which he grieved and about which he eventually filed a lawsuit.  See Moberg Decl. ¶¶ 16-20.

Plaintiff filed a level 3 grievance based on Bosley's denial at level 2.  See Bosley Decl. ¶ 4; Holbrook Decl. ¶ 3; Moberg Decl. ¶ 21.  On June 20, 2007, Holbrook, the County Superintendent, asked Plaintiff if she wanted to meet with Holbrook to discuss the level 3 grievance.  See Holbrook Decl. ¶ 3.  Plaintiff requested a one-on-one meeting.  See id.  Holbrook scheduled the meeting for June 28, 2007, which Plaintiff cancelled on June 25, 2007, and then changed her mind again.  See id. Plaintiff and her union representative met with Holbrook, who asked Plaintiff to explain the basis for her grievance, which she was not able to do to Holbrook's satisfaction.  See id.  Plaintiff agreed to provide further information, so the parties agreed to postpone the strict dates for the grievance procedure.  See id.  On July 7, 2007, Plaintiff submitted further information, and on July 13, 2007, Holbrook denied the grievance because it did not set forth a basis under the collective bargaining agreement.  See id. ¶ 3; Ex. A.  Holbrook stated that she was not motivated by race or national origin or Plaintiff's past complaints and that the first time Holbrook had ever interacted with Plaintiff was when she filed the level 3 grievance.  See id. ¶¶ 2-3.  The first time that Holbrook learned of the earlier harassment and discrimination claims concerning events prior to June 2007 was when Plaintiff filed this lawsuit in 2008.  See Holbrook Decl. ¶ 5.  Plaintiff then filed a charge of unfair labor practices with the Public Employment Relations Board regarding the false police report, and PERB ultimately denied the grievance.  See Holbrook Decl. ¶ 4.

On July 30, 2007, Bosley issued a written reprimand against Plaintiff regarding Plaintiff's conduct toward her co-worker Lisa Suruki.  See Njenga Decl. ¶ 137.  Suruki held an administrative position in the Student Services Division and the WorkAbility program.  See Suruki Decl. ¶ 1. Suruki states that one day when she was in the parking lot getting in her car to go to lunch, Plaintiff ran up to her and physically prevented her from getting in her car, saying that Plaintiff had an urgent matter to discuss, which turned out to be which background Plaintiff should choose for some stationery.  See Suruki Decl. ¶ 2.  In 2006, Plaintiff began calling Suruki numerous times about a requisition form from Plaintiff that Suruki had given to Pex.  See Suruki Decl. ¶ 3.  Suruki told Plaintiff that there was nothing more she could do, but Plaintiff kept calling her, three times one day, and four times in one day a few days later.  See id.  In the fall of 2006, Suruki began working in a new building, but Plaintiff saw her running into work one day and started calling after her and coming closer.  See id. ¶ 4.  Suruki was frightened and ran into her office.  See id.

During the summer of 2007, Suruki found out that Plaintiff had written a letter about Suruki, that had been left on the chair of another employee and then subsequently mailed to Suruki.  See Suruki Decl. ¶ 5; Ex. A; Bosley Decl. ¶ 6.  Suruki found the letter to be nasty in tone and to accuse Suruki of things that she did not do.  See Suruki Decl. ¶ 5.  Suruki met with Bosley and asked Bosley what her options were, and Bosley told Suruki about the grievance process.  See Suruki Decl. ¶ 5; Bosley Decl. ¶ 6 (stating that it was part of her job to counsel employees about the complaint process).  Suruki had another meeting about the letter on June 11, 2007, in which she was told about her right to file a formal grievance as well as a restraining order.  See Suruki Decl. ¶ 6.  Suruki states that no one at SMCOE told her to file a complaint; she made up her own mind.  See Suruki Decl. ¶ 8.  Suruki states that her sole reason for filing the complaint was to prevent Plaintiff from harassing her and that she was not motivated by race.  See id.  On June 19, 2007, when Suruki received the letter at her home, she decided to file a grievance.  See id. ¶ 7; Ex. B.

Bosley telephoned Plaintiff to tell her that a complaint had been filed against her by Suruki. See Bosley Decl. ¶ 6.  Plaintiff hung up during that conversation.  See id.  Bosley followed up with a letter on July 6, 2007.  See id. ¶ 6; Ex. C.  The certified letter was returned as unclaimed.  See id. Bosley sent another letter, but Plaintiff did not arrange to meet with her.  See id.  Bosley conducted

**United States District Court**
For the Northern District of California

1    her investigation without Plaintiff's input and concluded that Plaintiff had been harassing Suruki.

2    See id.; Ex. D.  Bosley issued a reprimand on July 30, 2007.  See id.

3          Plaintiff stated that her physical and psychological condition precluded her from returning to

4    work in November 2007.  See Njenga Decl. ¶ 138.  Bosley stated that she notified Plaintiff in

5    October 2007 that her leave would be running out in November.  See Bosley Decl. ¶ 8; Ex. F.

6    Bosley provided Plaintiff with the application form for unpaid leave.  See id. Ex. G.  Plaintiff filled

7    out the application, but did not put an ending date for her leave.  See id. ¶ 8.  On November 8, 2007,

8    Bosley denied Plaintiff's application for unpaid sick leave.  See Njenga Decl. ¶ 139.  Bosley

9    determined that she would not be able to find a qualified replacement for an indefinite term.  See

10   Bosley Decl. ¶ 8; Ex. H.  Bosley stated that Plaintiff was not terminated, but was placed on the

11   thirty-nine month rehire list, which gave her reemployment rights through February 8, 2010.  See

12   Bosley Decl. ¶ 8.  Bosley stated that other similarly situated white employees' requests for unpaid

13   leave have been denied.  See id.  Bosley was not motivated by race or national origin discrimination

14   or retaliation and she was not aware of any protected activity by Plaintiff until Plaintiff filed her

15   2008 EEOC charge.  See id. ¶ 8.  Bosley stated that she was not aware of Plaintiff's psychological

16   reason for not returning to work until this lawsuit was filed, and she assumed that the failure to

17   return to work was from Plaintiff's hip surgery.  See Bosley Reply Decl. ¶ 3.

18   **Legal Standard**

19         Summary judgment shall be granted if "the pleadings, discovery and disclosure materials on

20   file, and any affidavits show that there is no genuine issue as to any material fact and that the

21   movant is entitled to judgment as a matter of law."  Fed. R. Civ. Pro. 56(c).  Material facts are those

22   which may affect the outcome of the case.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

23   (1986).  A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury

24   to return a verdict for the nonmoving party.  Id.  The court must view the facts in the light most

25   favorable to the non-moving party and give it the benefit of all reasonable inferences to be drawn

26   from those facts.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The

27   court must not weigh the evidence or determine the truth of the matter, but only determine whether

28   there is a genuine issue for trial.  Balint v. Carson City, 180 F.3d 1047, 1054 (9th Cir. 1999).

**United States District Court**
For the Northern District of California

1    A party seeking summary judgment bears the initial burden of informing the court of the

2    basis for its motion, and of identifying those portions of the pleadings and discovery responses that

3    demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317,

4    323 (1986).  Where the moving party will have the burden of proof at trial, it must affirmatively

5    demonstrate that no reasonable trier of fact could find other than for the moving party.  On an issue

6    where the nonmoving party will bear the burden of proof at trial, the moving party can prevail

7    merely by pointing out to the district court that there is an absence of evidence to support the

8    nonmoving party's case.  Id.  If the moving party meets its initial burden, the opposing party "may

9    not rely merely on allegations or denials in its own pleading;" rather, it must set forth "specific facts

10    showing a genuine issue for trial."  See Fed. R. Civ. P. 56(e)(2); Anderson, 477 U.S. at 250.  If the

11    nonmoving party fails to show that there is a genuine issue for trial, "the moving party is entitled to

12    judgment as a matter of law."  Celotex, 477 U.S. at 323.

13    **Discussion**

14    **1.      Summary judgment is granted as to Plaintiff's claims under 42 U.S.C. §§ 1981, 1983**

15    Plaintiff alleged a violation of 42 U.S.C. § 1981 against all Defendants, and a violation of 42

16    U.S.C. § 1983 against the entity Defendant.  These claims are precluded by the Eleventh

17    Amendment.  See Eaglesmith v. Ward, 73 F.3d 857, 859-60 (9th Cir. 1995); Pittman v. Oregon, 509

18    F.3d 1065, 1070-71 (9th Cir. 2007) (§ 1981 does not contain claim against states).  Plaintiff

19    concedes that the First Amended Complaint erroneously claims a violation of § 1983 against the

20    entity Defendant and a violation of § 1981 against all Defendants, but seeks leave to amend the

21    complaint.

22    Plaintiff argued in her supplemental brief that the Court should grant leave to correct this

23    clerical error, and that Defendants will not suffer any prejudice if leave is granted.  Specifically,

24    Plaintiff argues that the issues pertaining to §§ 1981 and 1983 have been litigated since the

25    beginning of this case, and that amendment of the complaint would benefit Defendants because

26    claims against some Defendants would be removed.  However, as Defendants argue in their

27    supplemental brief, the benefit is negligible since the case has already proceeded through the

28    expensive and time-consuming process of summary judgment.

United States District Court
For the Northern District of California

1   Plaintiff also argues that Defendants could have asserted the qualified immunity defense, yet

2   chose not to, and in any event, that defense is not viable.  As Defendants point out, however, the

3   qualified immunity analysis is more complex than simply finding that the broad right to be free from

4   employment discrimination is clearly established.  In Saucier v. Katz, 533 U.S. 194, 201 (2001), the

5   Supreme Court mandated a two-step sequential process for resolving claims of qualified immunity.

6   First, courts consider the threshold question: "Taken in the light most favorable to the party asserting

7   the injury, do the facts alleged show the officer's conduct violated a constitutional right?"  Saucier,

8   533 U.S. at 201 ("In the course of determining whether a constitutional right was violated on the

9   premises alleged, a court might find it necessary to set forth principles which will become the basis

10  for a holding that a right is clearly established.").  Second, "if a violation could be made out on a

11  favorable view of the parties' submissions, the next, sequential step is to ask whether the right was

12  clearly established."  Id.  In Pearson v. Callahan, 129 S. Ct. 808, 818 ( 2009), the Court receded

13  from Saucier, holding "that the Saucier protocol should not be regarded as mandatory in all cases,"

14  but instead judges should exercise their sound discretion as to which of the two prongs of the

15  analysis to address first.  Id.   In Pearson, the Court determined that the officers in that case were

16  entitled to qualified immunity "on the ground that it was not clearly established at the time of the

17  search that their conduct was unconstitutional," without first deciding whether the facts shown by

18  the plaintiff constituted a violation of a constitutional right.  Id.

19  Although amendment is generally freely granted when justice requires under Federal Rule of

20  Civil Procedure 15, Plaintiff has not made a sufficient showing that justice requires amendment at

21  this late date after the deadline to amend the pleadings has passed, after discovery has closed, and

22  after this dispositive motion has been filed.  Further, because this motion was filed on November 10,

23  2009, Plaintiff has known about this deficiency in her complaint since at least that time (and perhaps

24  earlier as described below), yet did not take steps to correct the alleged clerical error until filing her

25  opposition almost three months later on February 2, 2010.  In fact, Defendants argue in their

26  supplemental brief that Plaintiff was on notice of the Eleventh Amendment issue as of the time of

27  the initial case management conference in November 2008 because the joint case management

28  conference listed the Eleventh Amendment immunity argument as a disputed legal issue.

1  Accordingly, Plaintiff's request to amend is untimely, and Defendants' motion for summary

2  judgment on these two claims is granted.

3

4  **2.**     **The defense set forth in <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998) is not applicable**

5

6      In <u>Burlington Industries, Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998), the Supreme Court stated:

7      An employer is subject to vicarious liability to a victimized employee for an
       actionable hostile environment created by a supervisor with immediate (or
8      successively higher) authority over the employee. When no tangible employment
       action is taken, a defending employer may raise an affirmative defense to liability or
9      damages, subject to proof by a preponderance of the evidence, see Fed. Rule Civ.
       Proc. 8(c). The defense comprises two necessary elements: (a) that the employer
10     exercised reasonable care to prevent and correct promptly any sexually harassing
       behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of
11     any preventive or corrective opportunities provided by the employer or to avoid harm
       otherwise. While proof that an employer had promulgated an antiharassment policy
12     with complaint procedure is not necessary in every instance as a matter of law, the
       need for a stated policy suitable to the employment circumstances may appropriately
13     be addressed in any case when litigating the first element of the defense. And while
       proof that an employee failed to fulfill the corresponding obligation of reasonable
14     care to avoid harm is not limited to showing any unreasonable failure to use any
       complaint procedure provided by the employer, a demonstration of such failure will
15     normally suffice to satisfy the employer's burden under the second element of the
       defense. No affirmative defense is available, however, when the supervisor's
16     harassment culminates in a tangible employment action, such as discharge, demotion,
       or undesirable reassignment.

17
   <u>Ellerth</u>, 524 U.S. at 765; <u>see also</u> <u>Nichols v. Azteca</u>, 256 F.3d 864, 877 (9th Cir. 2001).  Defendants
18
   argue that they are entitled to the <u>Ellerth</u> defense because at all times the County had a written
19
   discrimination and retaliation policy specifically intended to remedy harassing behavior (<u>see</u>
20
   Holbrook Decl. ¶ 7; Ex. B), and from 2005 through 2008, Plaintiff did not invoke that policy.
21
   Plaintiff, however, argues that the defense is not available because Plaintiff was terminated, and
22
   because Plaintiff repeatedly complained about harassment throughout the years.
23
       The Court cannot state as a matter of law that <u>Ellerth</u> applies in this case.  First, there is a
24
   dispute about whether Plaintiff was terminated.  Second, although it appears that Plaintiff did not file
25
   any EEOC charges for several years after 2004, there is some evidence that she complained
26
   informally about harassment to her supervisors during that time, and they did not take reasonable
27
   care to prevent and promptly correct any harassment.  See Tucker-Jones Decl. ¶ 38 (Plaintiff's
28
   complaints of discrimination and harassment "did not evaporate" after January 2004, and the

15

1    complaints continued: "It was very hard to make them [the complaints] go away.  They seemed to

2    grow different arms and other appendages as time went on up until I left [in 2006]"); ¶ 48(1) ("From

3    June 2004 up until my departure in June 2006, [Plaintiff] reported to me that when she asked Debbie

4    to clean her space, she responded with words to the effect that 'you should know how to do it

5    yourself.'"); ¶ 50 ("When I left, [Plaintiff] still had open grievances and concerns.").

6    **3.        Events occurring prior to February 5, 2007 are not time-barred**

7           To assert a claim under Title VII, a plaintiff must file an administrative charge with the

8    Equal Employment Opportunity Commission ("EEOC") within 180 days of the alleged unlawful

9    employment action or within 300 days of the unlawful practice if the plaintiff files an administrative

10   claim with a state agency first.  See 42 U.S.C. § 2000e-5(e)(1); Josephs v. Pacific Bell, 443 F.3d

11   1050, 1061 (9th Cir. 2003).  In order to assert a claim under the California FEHA, a plaintiff must

12   file an administrative charge with the DFEH within one year of the alleged unlawful act.  See Cal.

13   Gov't Code § 12960(d).  Plaintiff filed her charge with the EEOC and the state Department of Fair

14   Employment and Housing on February 5, 2008.  See Shupe Decl. Ex. A.  Therefore, Defendants

15   argue that Plaintiff's claims prior to February 5, 2007 are time-barred.

16          Defendants argue that there were only three events that occurred after February 5, 2007 that

17   are included in the 2008 EEOC charge: (1) the police break-in to Plaintiff's home on March 7, 2007;

18   (2) the reprimand of Plaintiff in July 2007 for harassing Suruki; and (3) the refusal of Plaintiff's

19   open-ended request for leave in November 2007.  Unless Plaintiff can satisfy the continuing

20   violation doctrine for the FEHA, the events prior to February 5, 2007 are not actionable.

21          The California Supreme Court applied the continuing violation doctrine to a retaliatory

22   course of conduct "for actions that take place outside the limitations period if these actions are

23   sufficiently linked to unlawful conduct that occurred within the limitations period."  Yanowitz v.

24   L'Oreal USA, 36 Cal. 4th 1028, 1056-58 (2005).  Under California law, a continuing violation exists

25   where the employer's unlawful actions are: (1) sufficiently similar in kind; (2) have occurred with

26   reasonable frequency; and (3) have not acquired a degree of permanence.  See Richards v. CH2M

27   Hill, Inc., 26 Cal. 4th 798, 823 (2001) (holding that when employer unlawfully refuses reasonable

28   accommodation of disabled employee or engages in disability harassment, statute of limitations

*United States District Court*
For the Northern District of California

16

1  begins to run either when course of conduct is brought to end or when employee is on notice that

2  further efforts to end unlawful conduct will be in vain); see also Valdez v. City of Los Angeles, 231

3  Cal. App. 3d 1043, 1052 (1991) (maintenance of discriminatory promotional system within one year

4  preceding appellant's filing his claim made the claim timely).

5      Defendants argue that Plaintiff cannot meet that standard because the actions that took place

6  within the limitations period were "classic personnel actions," yet the earlier misconduct did not

7  involve the same decision-makers and could not be characterized as personnel actions.  However, at

8  least some of the pre-February 5, 2007 events involve the same decision-maker, specifically Pex.

9  Further, Defendants argue that there is no evidence of reasonable frequency because no complaints

10  were made between 2004 and 2007.  Although there is no evidence that formal complaints were

11  made during that time, there is evidence that Plaintiff made informal complaints.  See Tucker-Jones

12  Decl. ¶¶ 38, 48(1), 50.  Defendants also argue that Defendants' alleged unlawful actions before

13  February 5, 2007 had achieved permanence because Plaintiff's 2004 EEOC charge had been

14  investigated and no further charges were filed until 2008.

15      Here, Plaintiff meets the Yanowitz/Richards test because the discriminatory and harassing

16  events before and after the limitations period were similar.  In fact, Plaintiff testified that

17  discriminatory conduct, including job assignment inequities, unequal access to job resources,

18  shunning and humiliation, occurred on a daily basis.  Plaintiff argues that the discrimination and

19  harassment all occurred within the same department with at least some of the same actors.  Plaintiff

20  also argues that the lack of permanence prong is met because her 2004 EEOC charge did not signal

21  finality because she continued thereafter to work with her employer to remedy the problems she was

22  having.

23      Although this question is a close one, the Court concludes that there is sufficient evidence to

24  raise a triable issue of fact as to an actionable continuing violation.  Further, even if the events could

25  not be part of a continuing violation, Plaintiff is not barred from using pre-limitations acts as

26  background evidence in support of her Title VII claim, even though she cannot seek damages for

27  those earlier incidents.  See National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002).

28  **4.      Defendants' motion for summary judgment as to Plaintiff's disparate treatment
         discrimination claims is denied.**

**United States District Court**
For the Northern District of California

1       Motions for summary judgment in employment discrimination actions are analyzed under the

2   burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

3   See, e.g., Chuang v. University of California Davis, 225 F.3d 1115, 1123-24 (9th Cir. 2000) (citing

4   McDonnell Douglas).  A plaintiff alleging disparate treatment must first establish a triable issue of

5   fact as to a prima facie case of discrimination by showing: (1) she belongs to a protected class; (2)

6   she was qualified for the position; (3) she was subject to an adverse employment action; and (4)

7   similarly situated individuals outside her protected class were treated more favorably.  See id.  The

8   proof necessary for a plaintiff to establish a prima facie case is "minimal" and need not even rise to

9   the level of a preponderance of the evidence.  See Reeves v. Sanderson Plumbing Prods., Inc., 530

10  U.S. 133, 143 (2000) (citing Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir. 1994)).  The

11  plaintiff need only offer evidence that "gives rise to an inference of unlawful discrimination," arising

12  either under the McDonnell Douglas presumption or by more direct evidence of discriminatory

13  intent.  Wallis, 26 F.3d at 889.

14      Once a plaintiff has sufficiently shown a prima facie case of discrimination, the defendant is

15  entitled to come forward with a legitimate, nondiscriminatory reason for the adverse employment

16  action.  See Reeves, 530 U.S. at 142 (citing Texas Dep't of Community Affairs v. Burdine, 450 U.S.

17  248, 254 (1981)).  The defendant's burden at this stage is one of production, not persuasion.  The

18  court may not make a credibility assessment.  See Reeves, 530 U.S. at 142 (citing St. Mary's Honor

19  Ctr. v. Hicks, 509 U.S. 502, 509 (1993)).

20      If the defendant offers admissible evidence of a legitimate, nondiscriminatory reason for the

21  claimed adverse action, the McDonnell Douglas framework and its presumption of discrimination

22  disappears, and the plaintiff is left to prove by a preponderance of the evidence that the reasons

23  offered by the defendant are merely a pretext for discrimination.  See Reeves, 530 U.S. at 143

24  (citations omitted); Chuang, 225 F.3d at 1124 (the plaintiff must show that the articulated reason is

25  pretextual, "'either directly by persuading a discriminatory reason more likely motivated the

26  employer or indirectly by showing that the employer's proffered explanation is unworthy of

27  credence.'") (quoting Texas Dep't of Community Affairs v. Burdine, 450 U.S. 248, 256 (1981)).

28  The ultimate burden of persuading the trier of fact that the employer intentionally discriminated

18

**United States District Court**
For the Northern District of California

1    remains at all times with the plaintiff.  See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S.

2    133, 143 (2000) (citing Burdine, 450 U.S. at 253).

3          Here, Defendants do not challenge Plaintiff's prima facie case.  Instead they argue that they

4    have met their burden of showing undisputed legitimate non-discriminatory reasons for their actions,

5    and that Plaintiff has not raised a triable issue of pretext.[1]

6          **Legitimate, non-discriminatory reasons**

7          Defendants have met their burden of offering evidence of legitimate non-discriminatory

8    reasons for their conduct.  First, with respect to the police welfare check, Pex testified that the extent

9    of her involvement was to call a few people to try and find out where Plaintiff was, and then to

10   express her concerns to Harriman, who subsequently made the decision to call the police in

11   consultation with Aaronian but independent of Pex.  There is no evidence that Pex suggested

12   contacting the police.  And there is no evidence that Harriman or Aaronian considered any illegal

13   factor in making the decision to call the police.  Plaintiff has cited no requirement that Pex search

14   out any employee who might know of Plaintiff's whereabouts during an undisclosed absence.

15   Plaintiff argued in her supplemental brief that she gave advance notice to Harriet Beck, which was

16   the authorized procedure.  See Supp. Memo in Opp. to Mot. for Summ. J. at 4.  She also argued that

17   she need not notify her immediate supervisor when taking a five-day absence.  Id.  Plaintiff's

18   argument, however, is overstated.  Plaintiff's declaration states only that she notified Harriet Beck of

19   her absence, but is silent on the appropriate procedure to notify her employer of her absence.  See

20

21          [1]   Defendants argue that Plaintiff has offered no evidence of gender-based discrimination or
     harassment, so summary judgment should be granted as to her gender discrimination claim even if it is
22   denied as to race and national origin discrimination.  However, the Ninth Circuit has cautioned against
     isolating Plaintiff's gender discrimination claim from her race and national origin discrimination claims
23   on summary judgment, particularly because Plaintiff has alleged discrimination based on color, race,
     national origin, and gender, *or a combination of those* factors (see First Am. Compl. ¶ 36).  See Lam
24   v. University of Hawaii, 40 F.3d 1551, 1562 (9th Cir. 1994) ("At least equally significant is the error
     committed by the court in its separate treatment of race and sex discrimination.  As other courts have
25   recognized, where two bases for discrimination exist, they cannot be neatly reduced to distinct
     components.  Rather than aiding the decisional process, the attempt to bisect a person's identity at the
26   intersection of race and gender often distorts or ignores the particular nature of their experiences. . . .
     Accordingly, we agree with the Jefferies court that, when a plaintiff is claiming race and sex bias, it is
27   necessary to determine whether the employer discriminates on the basis of that combination of factors,
     not just whether it discriminates against people of the same race or of the same sex.") (internal citations
28   omitted).  Accordingly, the Court does not grant summary judgment on Plaintiff's gender discrimination
     claim on this basis.

United States District Court
For the Northern District of California

1    Njenga Decl. ¶¶ 108-113.  Moreover, Plaintiff's declaration states that she may be absent for five

2    days from work without producing a doctor's note, not that she need not inform her immediate

3    supervisor of her absence.  See Njenga Decl. ¶ 114.

4         Second, with respect to the July 30, 2007 reprimand involving Suruki, Defendants have

5    provided evidence that Plaintiff twice sent a "poison pen" letter to Suruki at work, and on the second

6    occasion, Suruki decided on her own, after getting information from Bosley and others about her

7    options, to file a complaint.  See Suruki Decl. ¶¶ 5, 8; cf. Davis Decl. Ex. C at 83-84 ("Q: Ms.

8    Suruki, it wasn't your idea in the first place to file the formal grievance, was it? [objection omitted]

9    A: No.  It was Jeannie Bosley.").  As director of human resources, Bosley was required to and did

10   investigate the complaint, and sought Plaintiff's input, but Plaintiff refused to meet with her.

11   Thereafter, Bosley determined that Plaintiff had sent the letter to Suruki and reprimanded her for

12   that.  Bosley has stated that she acted without discriminatory intent.

13        Third, with respect to the November 8, 2007 denial of open-ended leave, Defendants have

14   provided evidence that Bosley denied the leave due to the open-ended nature of the request.  Further,

15   she stated that she would have had difficulty in finding a competent replacement willing to work for

16   an uncertain amount of time.  Thus, Defendants have met their burden of offering undisputed

17   evidence of legitimate, non-discriminatory reasons for their conduct.

18        **Pretext**

19        Plaintiff makes several different arguments to support a showing of pretext.  Based on some

20   of those arguments, the Court concludes that Plaintiff has shown a triable issue of fact as to pretext

21   sufficient to defeat summary judgment.  Although some of the evidence for pretext occurred outside

22   the statute of limitations, those incidents may be used to establish motive and provide a context for

23   Plaintiff's present allegations.  See Carpinteria Valley Farms, Ltd. v. County of Santa Barbara, 344

24   F.3d 822, 832 (9th Cir. 2003).

25        Plaintiff argues generally that numerical evidence shows that SMCOE's employment

26   hierarchy is "racialized" because over 90% of its employees are white, and Plaintiff was the only

27   African in the Secondary Services Division and the only certificated personnel of African descent in

28   the WorkAbility program.  See McDonnell, 411 U.S. at 805 ("On the latter point, statistics as to

United States District Court
For the Northern District of California

1  petitioner's employment policy and practice may be helpful to a determination of whether

2  petitioner's refusal to rehire respondent in this case conformed to a general pattern of discrimination

3  against blacks.").  Plaintiff argues that this "inexorable zero" raises a triable issue of fact as to

4  whether Defendants had a discriminatory purpose.  International Brotherhood of Teamsters v United

5  States, 431 U.S. 324, 342 n. 23 (1977).  Defendants argue that these statistics do not show a

6  racialized employment hierarchy because Bosley was not hired until April 2007 and cannot be

7  responsible for past employment practices.  See Reply at n. 5 (noting that under the direction of

8  Bosley and Holbrook, percentage of non-Caucasian employees has risen by 4.2%).  However,

9  Plaintiff is alleging a racially discriminatory environment over her entire employment, not just since

10  Bosley was hired.  Further, although Defendants provide evidence that the SMCOE employs 490

11  persons, of whom 219 are non-Caucasian, there is no showing with respect to how many of them are

12  African or African-American employees.  See Bosley Reply Decl. ¶ 2.  While statistics alone might

13  not be sufficient to establish a triable issue of fact as to pretext, Plaintiff also points to other

14  evidence.

15  Plaintiff points to her own history of experiencing discrimination such as unequal work

16  assignments, unequal access to job resources and unequal access to professional development

17  opportunities.  In addition, Tucker-Jones, an African-American female, testified as to how the

18  WorkAbility division was "the most dysfunctional and most riddled with internal conflict, including

19  race-based conflict."  Tucker-Jones Decl. ¶ 20.

20  Plaintiff also argues generally that a triable issue of fact as to pretext can be inferred from the

21  racially offensive comments Plaintiff endured from 1998 through 2007.  In particular, Pex was a

22  decision-maker who is alleged to have made a comment which could be interpreted as being about

23  Plaintiff's interracial marriage.  Although Pex denies having made the statement, there is a triable

24  issue of fact on that point.  Further, although there is no evidence that Pex actively participated in

25  the decision to call the police, her actions led to Harriman instructing Aaronian to call them,

26  arguably a foreseeable consequence.

27  In addition, Plaintiff generally argues that the existence of other acts of discrimination raises

28  a triable issue of fact as to discrimination.  Here, Plaintiff points to complaints by three black women

**United States District Court**
For the Northern District of California

1    (Jacque Taliaferro, Lorrie Owens, and Plaintiff) and one Asian woman (Judy Chin) that they were

2    victims of disparate treatment at SMCOE.  See Davis Decl. Ex. A, B;  see Heyne v. Caruso, 69 F.3d

3    1475, 1480 (9th Cir. 1995) ("Similarly, we recently held that evidence of an employer's sexual

4    harassment of female employees other than the plaintiff and evidence of the employer's disparaging

5    remarks about women in general were relevant to a discriminatory discharge claim which alleged

6    that the plaintiff's discharge was motivated by the employer's general feeling of hostility towards

7    women.") (internal citation omitted).

8            With respect to the July 30, 2007 reprimand involving Suruki, Plaintiff argues that Bosley

9    urged Suruki to file a complaint against Plaintiff.  Specifically, Suruki testified that it was Bosley's

10   idea in the first place that Suruki file a grievance.  See Davis Decl. Ex. C at 83-84.  Although this is

11   consistent with Bosley's declaration that, pursuant to her job duties, she informed Suruki of her

12   options and asked her if she wanted to file a complaint (see Bosley Decl. ¶ 6), Suruki also testified

13   that in a second meeting, she was asked by either Bosley or Glenn Siegel (the Director of Classified

14   Personnel) whether she wanted to file a temporary restraining order and was told that she should

15   seriously consider it.  See Davis Decl. Ex. C at 81-82; 85.  Suruki stated in her declaration that the

16   decision to file a complaint was hers alone (see Suruki Decl. ¶ 8), but at the same time the evidence

17   is susceptible of the inference that Defendants gave Suruki the idea to do so and encouraged her to

18   proceed.  Viewing all the evidence in the light most favorable to Plaintiff, there is a triable issue of

19   fact as to whether Defendants' conduct with respect to the reprimand was pretextual.

20           Plaintiff also argues that discriminatory intent can be inferred based on an email from a

21   private investigator to County personnel stating that he could do surveillance on Plaintiff to catch

22   her violating some work policy.  See Davis Decl. Ex. E.  This email, however, is inadmissible

23   because it is protected by the attorney-client privilege and work product doctrine.[2]

24   _____

25           [2]    Defendants argue that this document was inadvertently produced during discovery, and that
     it is protected by attorney-client privilege and the work product doctrine.  See Reply Shupe Decl. ¶ 2;
26   Ex. A.  Federal Rule of Evidence 502(b) governs the question of whether the disclosure of a privileged
     document constitutes a waiver of the privilege.  Under that Rule, there is no waiver if the disclosure was
27   inadvertent, the holder of the privilege took reasonable steps to prevent disclosure and the holder
     promptly took reasonable steps to rectify the error upon discovering it.  Here, Defendants have met the
28   requirements of Rule 502(b).  Defendants have established through counsel's declaration that the
     disclosure was inadvertent and that Defendants took reasonable steps to prevent its disclosure in the first

**United States District Court**
For the Northern District of California

With respect to the denial of open-ended leave, Plaintiff appears to argue that this action was a pretext for discrimination because Defendants terminated her when she was in a "fragile psychological condition." Opp. at 11. Defendants have produced evidence showing that until Plaintiff filed this action, the only knowledge her employer had about the reason for her not returning to work was her hip surgery. See Bosley Reply Decl. ¶ 3. As described below, however, there is evidence from which a reasonable inference can be drawn that Bosley had information about Plaintiff's history of raising complaints of discrimination and harassment a few months before she denied Plaintiff's leave. Bosley states in her declaration that her first contact with Plaintiff was at the June 7, 2007 level 2 grievance meeting regarding the report to the police. See Bosley Decl. ¶ 4. Moberg, Plaintiff's union representative, stated that at this meeting, he told Bosley that this was an old case, that Plaintiff had previously filed claims of discrimination, that she had been previously

---

place. See Declaration of John Shupe re: Inadvertent Disclosure ¶ 2 (describing document review and Bates-stamp process, and stating that documents were reviewed and segregated by counsel based on privilege and were placed in a folder entitled: "Njenga: Documents not to be produced."). Defendants also took prompt and reasonable steps to rectify the error by sending a letter one week after it discovered the inadvertent disclosure when the exhibit was filed in Plaintiff's opposition. Plaintiff argues, however, that the email is not protected by either the attorney-client privilege because it is not a communication between a lawyer and client, or the work product doctrine because it was not prepared in anticipation of litigation. However, the document is privileged because it was authored by a private investigator hired by the County Counsel's office to provide suggestions on steps the County Superintendent might take with respect to Plaintiff because the County's counsel viewed Plaintiff as threatening litigation. See Declaration of John Beiers ¶ 2; see also VISA U.S.A., Inc. v. First Data Corp., 2004 WL 1878209, at *4-5 (N.D. Cal. Aug. 23, 2004) (stating that "'courts have extended the [attorney-client] privilege to the substantive advice and technical assistance' of agents of the attorney.") (internal citation omitted) (citing United States v. Kovel, 296 F.2d 918 (2d Cir. 1961) (finding that the attorney-client privilege applied to communications by a client to an accountant in the attorney's office where the communications were incident to obtaining legal advice and where the presence of the accountant was "necessary, or at least highly useful. . . ."). Further, the investigator's report was treated as privileged because it was part of Mr. Beiers' communication with his client and the investigator hired by counsel's office. See id. With respect to the work product doctrine, Mr. Beiers stated that he viewed Plaintiff as threatening litigation arising from a grievance, which caused at least in part the County's counsel to hire the investigator. See Beiers Decl. ¶ 2. Even though Plaintiff argues that Defendants could not have anticipated litigation in February 2007 when they hired the investigator, they have provided no evidence to support a finding that Defendants did not reasonably anticipate litigation. The work product protection extends to agents of an attorney. See Fed. R. Civ. P. 26(b)(3)(A); United States v. ChevronTexaco Corp., 241 F. Supp. 2d 1065, 1087 (N.D. Cal. 2002). The Court concludes that the document, which is protected by the attorney-client privilege and the work product doctrine, was inadvertently produced and that, therefore, the privilege has not been waived.

United States District Court
For the Northern District of California

1  subjected to discrimination and retaliation, and that the police report was retaliatory.[3]  See Moberg

2  Decl. ¶ 15.  Further, there is evidence that Bosley examined Plaintiff's personnel file on June 11,

3  2007 (see Davis Decl. Ex. M) and that such prior complaints are regularly kept in personnel files

4  (see Tucker-Jones Decl. ¶ 61).

5       Further, Plaintiff argues that even if the exhaustion of sick leave were a legitimate factor in

6  terminating Plaintiff, "this does not purge the taint of illegitimate factors arising out of years of

7  workplace harassment."  See Opp. at 14.  As Defendants point out, Bosley, who made the

8  termination decision, did not have a lengthy history with Plaintiff as Bosley was only hired in April

9  2007, after Plaintiff left her employment to go on extended sick leave, and states that she did not

10  terminate Plaintiff because of her race or national origin.  See Bosley Decl. ¶ 9.  On the other hand,

11  Plaintiff alleges a lengthy history of harassment and discrimination involving at least one decision-

12  maker, Pex, and a reasonable inference can be drawn that Bosley knew of this history because she

13  examined Plaintiff's personnel file and there is evidence that Moberg told her of the history of

14  Plaintiff's employment complaints.  Accordingly, there is at least a triable issue of fact as to whether

15  Bosley's denial of Plaintiff's leave was pretextual.

16       Plaintiff also points to a handwritten draft of a letter dated March 22, 2007 giving Plaintiff

17  notification of the intent to determine Plaintiff's future with SMCOE.  See Davis Decl. Ex. F.  But

18  this draft letter, which appears to have contemplated formal action against Plaintiff based on her

19  falsification of time cards, does not raise a triable issue of fact that the reprimand for the Suruki

20  letter was a pretext for discrimination.  As Defendants point out, Plaintiff has not argued that

21  falsification of time records would not warrant discipline and, in fact, Plaintiff was not disciplined

22  for it.  See Reply at n.3.

23       Plaintiff also argues that Bosley's reason for termination was pretextual because Defendants'

24  documents show that almost 70% of the individuals terminated at SMCOE due to paid sick leave

25  exhaustion are people of color, and people of color are only 10% of the general Secondary Services

26

27

28       [3]  Defendants object to paragraph 15 as inadmissible hearsay.  However, paragraph 15 is not hearsay as to whether Moberg made the statements, thus putting Bosley on notice, but only as to whether the statements are true in substance.

United States District Court
For the Northern District of California

employee population.  Opp. at 11, 15.[4]  Defendants argue persuasively, however, that this evidence is not probative of discrimination.  Plaintiff has presented no evidence showing that extended leave requests from white employees are treated more favorably, which would be a relevant statistic.

On balance, examining the evidence in the light most favorable to Plaintiff, she has raised a triable issue of fact as to whether Defendants' legitimate, non-discriminatory reasons were a pretext for discrimination.  Therefore, Defendants' motion for summary judgment with respect to Plaintiff's discrimination claim is denied.

**5.    Defendants' motion for summary judgment of Plaintiff's hostile work environment claim is denied**

To assert a Title VII claim based on a hostile work environment, a claimant must allege a "pattern of ongoing and persistent harassment severe enough to alter the conditions of employment." Burrell v. Star Nursery, Inc., 170 F.3d 951, 954 (9th Cir. 1999).  California courts look to federal law on Title VII discrimination claims to interpret analogous provisions of FEHA.  Mixon v. Fair Employment and Housing Comm'n, 192 Cal. App. 3d 1306, 1316-17 (1987).  "In order to prevail on her hostile work environment claim, [plaintiff] must show that her 'workplace [was] permeated with discriminatory intimidation . . . that [was] sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment.'  The working environment must both subjectively and objectively be perceived as abusive."  Brooks v. City of San Mateo, 229 F.3d 917, 924 (9th Cir. 2000) (citations omitted); see also Fuller v. City of Oakland, 47 F.3d 1522, 1527 (9th Cir. 1995); McGinest v. GTE Serv. Corp., 360 F.3d 1103, 1113 (9th Cir. 2004) ("Simply causing an employee offense based on an isolated comment is not sufficient to create actionable harassment under Title VII.  However, the harassment need not cause diagnosed psychological injury.  It is enough 'if such hostile conduct pollutes the victim's workplace, making it more difficult for her to do her job, to take pride in her work, and to desire to stay on in her position.'") (internal citations omitted).

---

[4]    In connection with Plaintiff's statistics, Plaintiff asks the Court to take judicial notice of Census Bureau data for 2005-2007 showing that the general population of the County was 62.8% white, whereas the Secondary Services Division is 91% white.  See Tucker-Jones Decl. ¶ 10.  The Court takes judicial notice of this data, but it has little probative value because it does not show what percentage of the general population are qualified to work in the Secondary Services Division, among other things.

United States District Court
For the Northern District of California

The Ninth Circuit uses a "totality of the circumstances test to determine whether a plaintiff's allegations make out a colorable claim of hostile work environment," considering factors such as "frequency, severity and level of interference with work performance." Brooks, 229 F.3d at 924. "When assessing the objective portion of a plaintiff's claim, [the court] assume[s] the perspective of the reasonable victim." Id. (citations omitted); McGinest, 360 F.3d at 1115 ("We now state explicitly what was clear from our holding in Ellison, that allegations of a racially hostile workplace must be assessed from the perspective of a reasonable person belonging to the racial or ethnic group of the plaintiff."). Further, "[i]n evaluating the objective hostility of a work environment, the factors to be considered include the 'frequency of discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" McGinest, 360 F.3d at 1113.

In determining what constitutes sufficiently pervasive harassment, courts have held that acts of harassment cannot be occasional, isolated, sporadic, or trivial. Rather, the plaintiff must show a concerted pattern of harassment of a repeated, routine or a generalized nature. See Fisher v. San Pedro Peninsula Hosp., 214 Cal. App. 3d 590, 610 (1989) (stating that while an employee "need not prove tangible job detriment to establish a sexual harassment claim, the absence of such detriment requires a commensurately higher showing that the sexually harassing conduct was pervasive and destructive of the working environment.").

Plaintiff argues that she has made the objective and subjective showing required to survive summary judgment. Specifically, Plaintiff points to an eight-year pattern of harassment, including being shunned and ostracized, disrespected during meetings and daily interactions, asked about black magic and her tribal body art, deprived of equal professional development opportunities, subjected to heightened scrutiny, falsely reported as dead to the police, and terminated. Further, Plaintiff notes that she observed that Defendants harassed Tucker-Jones, a female African-American. Plaintiff testifies that she believes that all of the conduct she described was racially motivated, which creates a triable issue of fact as to the subjective prong of the test. Objectively, the evidence presented by Plaintiff creates a triable issue of fact as to a hostile work environment. There is evidence that from the perspective of a reasonable African woman, the events at SMCOE

26

**United States District Court**
For the Northern District of California

1   were frequent, almost daily, and in some cases were physically threatening.  Plaintiff has raised a

2   triable issue of fact as to whether the harassment unreasonably interfered with her work because, for

3   example, she was assigned to schools on opposite ends of the County and was denied equal access to

4   work supplies and equipment and a clean workplace.  Viewing the evidence in the light most

5   favorable to Plaintiff, a reasonable jury could find that Plaintiff was subjected to a hostile work

6   environment.  Therefore, summary judgment as to Plaintiff's hostile work environment claim is

7   denied.

8   **6.      Defendants' motion for summary judgment of Plaintiff's retaliation claim is denied.**

9          The elements of a prima facie retaliation claim are that:  (1) plaintiff undertook a protected

10   activity; (2) her employer subjected her to an adverse employment action; and (3) a causal link

11   exists between the two events.  See Vasquez v. County of Los Angeles, 349 F.3d 634, 646 (9th Cir.

12   2004) (Title VII); Yanowitz v. L'Oreal USA, Inc., 36 Cal. 4th 1028, 1042 (2005) (FEHA).

13   Causation "may be inferred from circumstantial evidence, such as the employer's knowledge that the

14   plaintiff engaged in protected activities and the proximity in time between the protected action and

15   the allegedly retaliatory employment decision."  Yartzoff v. Thomas, 809 F.2d 1371, 1376 (9th Cir.

16   1987); see also Flait v. No. American Watch Corp., 3 Cal. App.4th 467, 478 (1992) (reversing

17   judgment for employer on motion for summary adjudication where circumstantial evidence of causal

18   link raised issue of fact).  To show a causal connection, a plaintiff "must make some showing

19   sufficient for a reasonable trier of fact to infer that the defendant was aware that the plaintiff had

20   engaged in protected activity."  Raad v. Fairbanks N. Star Borough School Dist., 323 F.3d 1185,

21   1197 (9th Cir. 2003).

22          Once a plaintiff produces evidence supporting a prima facie case, the burden shifts to the

23   defendant employer to articulate a legitimate, non-retaliatory reason for the adverse employment

24   action.  Once the employer articulates such a reason, a plaintiff bears the burden of demonstrating

25   that the reason was merely a pretext for the unlawful retaliatory motive.  See Stegall v. Citadel

26   Broad. Co., 350 F.3d 1061, 1066 (9th Cir. 2003); Yanowitz, 36 Cal. 4th at 1042.  A plaintiff can

27   prove pretext with either direct or indirect evidence.  If a plaintiff offers direct evidence of

28   discriminatory motive, a triable issue as to the actual motivation of the employer is created even if

1  the evidence is not substantial.  When direct evidence is unavailable, however, and the plaintiff

2  proffers only circumstantial evidence that the employer's motives were different from its stated

3  motives, specific and substantial evidence of pretext is required to survive summary judgment.

4  Stegall v. Citadel Broad. Co., 350 F.3d 1061, 1066 (9th Cir. 2003) (citing Godwin v. Hunt Wesson,

5  Inc., 150 F. 3d 1217, 1221 (9th Cir. 1998)).[5]

6          Plaintiff argues that the harassment she experienced was in retaliation for her May 2004

7  EEOC complaint, and her earlier internal complaints of discrimination in the late 1990's, 2001 and

8  2003.  Plaintiff bases her argument on Tucker-Jones' declaration that Plaintiff was retaliated against

9  from January 2004 forward for having "negative attention brought to bear on the unit . . . She was

10  isolated, ignored and ostracized."[6]  Tucker-Jones Decl. ¶ 39.   "Temporal proximity between

11  protected activity and an adverse employment action can by itself constitute sufficient circumstantial

12  evidence of retaliation in some cases."  Bell v. Clackamas County, 341 F.3d 858, 865 (9th Cir. 2003)

13  (citing cases); see also Winarto v. Toshiba, 274 F.3d 1276, 1285 (9th Cir. 2001).  Therefore, it can

14  be inferred from Tucker-Jones' testimony, as well as from Plaintiff's testimony, that she experienced

15  harassment and discrimination on an ongoing basis, and that the temporal proximity between the

16  protected activity and the harassment constituted retaliation.  Further, Plaintiff argues that the acts of

17  retaliation include the false police report in March 2007, the July 30, 2007 reprimand and the

18  termination in November 2007.  These events, however, are not in close temporal proximity with the

19  2004 EEOC complaint.

20          Defendants argue that Plaintiff has failed to make out the causal element of her prima facie

21  case.  Specifically, with respect to the police report, Defendants argue that Pex's involvement in the

22

23      [5]    As noted in Stegall, the Supreme Court's decision in Desert Palace, Inc. v. Costa, 539 U.S.
90 (2003), undermines Godwin to the extent that it implies that direct evidence is more probative than
24  circumstantial evidence, but upholds Godwin to the extent that a plaintiff still needs to proffer specific
and substantial evidence of pretext to overcome the summary judgment motion.  Stegall, 350 F.3d at
25  1066; see also Cornwell v. Electra Cent. Credit Union, 439 F.3d 1018, 1031 (9th Cir. 2006) ("Although
there may be some tension . . . on this point -- several of our cases decided after Costa repeat the
26  Godwin requirement that a plaintiff's circumstantial evidence of pretext must be 'specific' and
'substantial'").

27      [6]    Defendants object to paragraph 39 of Tucker-Jones' declaration as improper legal
28  conclusion.  Tucker-Jones' conclusion that Plaintiff experienced retaliation is an improper legal
conclusion, but the statements regarding Plaintiff's treatment are factual, not legal conclusions.
Accordingly, Defendants' objection is overruled in part.

efforts to locate Plaintiff ended when she told Harriman that she was concerned about Plaintiff. However, a reasonable inference can be drawn that Pex's actions set in motion the chain of events that led to the police check of Plaintiff's home. Although Pex states that she did not know about Plaintiff's May 2004 EEOC complaint until after Plaintiff filed this lawsuit (<u>see</u> Pex Decl. ¶ 4), there is evidence that she knew of other complaints by Plaintiff, including the complaint about Burse, when those complaints occurred in 2003 and 2004, when Pex supervised Plaintiff. Pex also states that from the fall of 2006 through March 2007 when Plaintiff stopped coming to work, Plaintiff did not make any complaints of discrimination or retaliation or harassment. <u>See</u> Pex Decl. ¶ 10. However, there is evidence that Plaintiff made regular informal complaints. <u>See</u> Tucker-Jones Decl. ¶¶ 38, 48(1), 50. This is a close question, and it is perhaps doubtful that Plaintiff can prevail in her claim that the police welfare check was discriminatory or retaliatory. However, examining the evidence in the light most favorable to Plaintiff, there is a triable issue of fact as to whether Pex knew of the May 2004 EEOC complaint and retaliated against Plaintiff through her involvement with the call to the police.

With respect to the July 30, 2007 reprimand by Bosley regarding Suruki and Bosley's denial of open-ended leave in November 2007, Defendants argue that it is uncontroverted that Bosley, who just began her employment in April 2007 in a supervisory capacity over Plaintiff, had no knowledge of Plaintiff's prior complaints when she made these decisions. However, as described above, there is evidence that supports an inference that Bosley knew of Plaintiff's complaint history at least as of June 7, 2007. Viewing the evidence in the light most favorable to Plaintiff, there is a triable issue of fact as to Plaintiff's prima facie case for retaliation as to the reprimand and the denial of leave.

As described above, Defendants have shown a legitimate reason for the reprimand and the denial of leave, and Plaintiff has raised a triable issue of fact as to pretext. Therefore, Defendants' motion for summary judgment on Plaintiff's retaliation claim based on the July 2007 reprimand and the leave is denied.

**7.      Plaintiff's claim for failure to prevent discrimination survives.**

Plaintiff has a claim against the County entity for failure to prevent discrimination and harassment under California Government Code § 12940(k), which states:

**United States District Court**
For the Northern District of California

It shall be an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California:

   ***

For an employer, labor organization, employment agency, apprenticeship training program, or any training program leading to employment, to fail to take all reasonable steps necessary to prevent discrimination and harassment from occurring.

See also Northrop Grumman Corp. v. Workers' Comp. Appeals Bd., 103 Cal.App.4th 1021, 1035 (2002) ("Moreover, employers must 'take all reasonable steps necessary to prevent discrimination and harassment from occurring.'").  Plaintiff argues that Holbrook failed to take steps to end the harassment of Plaintiff and so summary judgment should not be granted on this claim.  Defendants did not move for summary judgment on this claim, and they do not mention it in their reply brief.  In any event, because the Court concludes that there is a triable issue of fact as to discrimination, this claim also survives summary judgment.

**Conclusion**

   Accordingly, Defendants' motion for summary judgment is granted in part and denied in part.  The Court's ruling on the remaining evidentiary objections will be set forth in a separate Order.

**IT IS SO ORDERED.**

Dated: March 30, 2010

_____
ELIZABETH D. LAPORTE
United States Magistrate Judge